THE SPERRY AND HUTCHINSON COMPANY & another *vs.*
DIRECTOR OF THE DIVISION ON THE NECESSARIES
OF LIFE.

Suffolk.  May 8, 1940. — November 26, 1940.

Present: FIELD, C.J., LUMMUS, DOLAN, COX, & RONAN, JJ.

*Motor Fuel Sales Act. Equity Jurisdiction,* To enjoin enforcement of
unconstitutional statute. *Constitutional Law,* Due process of law,
Police power. *Trading Stamps. Gasoline.*

Equity had jurisdiction of a suit, brought by a corporation engaged in
the business of issuing and redeeming trading stamps and by one of
its customers who was a retail dealer in motor fuel within the definition
contained in § 295A of G. L. (Ter. Ed.) c. 94 in the form appearing in
St. 1939, c. 459, § 1, and seeking that the director of the division on
the necessaries of life be enjoined from enforcing § 295E, added to c. 94
by said c. 459, and that that section be declared unconstitutional in
so far as it prohibits the issuance of trading stamps by the plaintiff
corporation to retail dealers and by them to customers and restricts
the right of retail dealers in motor fuel to fix or change the price of
motor fuel.
Section 295E, added to G. L. (Ter. Ed.) c. 94 by St. 1939, c. 459, § 1,
so far as it prohibits the use of trading stamps in connection with
sales of motor fuels, the changing of prices for twenty-four hours and
sales at prices other than those posted, is not a valid exercise of the
police power because it bears no reasonable relation to the prevention
of fraud upon the public and is arbitrary and capricious; and it is un-
constitutional as in violation of arts. 1 and 10 of the Declaration of
Rights.

BILL IN EQUITY, filed in the Superior Court on November
24, 1939.

The prayers of the bill were in substance: (1) that the
rights of the parties be determined and declared, and that a
decree be rendered adjudging the rights of the parties; (2)
that the issuance of "S. & H. Legal Green Stamps" or "S.
& H. Green Stamps" by retail dealers of motor fuel, in
consideration of the payment of cash or prompt payment,
be declared legal and not prohibited by St. 1939, c. 459;
(3) and (4) that that statute, in so far as it may prohibit the

issuance of such trading stamps in connection with the sale of motor fuel, and in connection with the sale of other commodities or services by persons who also engage in the sale of motor fuel, be declared unconstitutional; (5) that so much thereof as may restrict the right of the plaintiff, Ouellette, or other retail dealers in motor fuel, to fix or change the price of motor fuel, for any period of time, be declared unconstitutional; and (6) that the defendant be enjoined from interfering with or prosecuting the plaintiffs, or other licensees of the plaintiff corporation for issuing its trading stamps in consideration of cash or prompt payment in connection with the sale of motor fuel, or the sale of other commodities sold together with motor fuel at a fixed price, and "from in any other manner interfering, or attempting, or threatening to enforce the provisions of said statute, or so much thereof as may relate or purport to relate, or be construed to the use of" such trading stamps.

The suit was reserved by *Donnelly,* J., for determination by this court.

*C. G. Smith* of New York, (*R. Wait* with him,) for the plaintiffs.

*R. Clapp,* Assistant Attorney General, for the respondent.

Cox, J. This is a bill in equity and comes to this court upon the reservation of a judge of the Superior Court, "upon the pleadings and statement of agreed facts," it appearing that the parties "have agreed on all material facts not admitted in the pleadings and that the case is ripe for the entry of final decree thereon." G. L. (Ter. Ed.) c. 214, § 31. The constitutionality of § 295E, inserted in G. L. (Ter. Ed.) c. 94 by St. 1939, c. 459, § 1, is involved, as well as the applicability to the plaintiffs of said § 295E, and of § 295C of said c. 94 in the amended form appearing in said c. 459.

The plaintiff Ouellette, hereinafter referred to as Ouellette, is a "retail dealer" in "motor fuel," as defined in § 295A of said c. 94. The Sperry and Hutchinson Company, hereinafter referred to as the corporation, is a foreign corporation authorized to do business in this Commonwealth since 1901. For many years it has been engaged in the

business of issuing and redeeming trading stamps, and in November, 1937, Ouellette and the corporation entered into a written agreement in accordance with which the corporation has been furnishing some of its trading stamps to him at the price of $2.50 per thousand, and Ouellette, in accordance with the agreement, has been issuing these trading stamps to his customers who purchase motor fuel sold at retail from his pumps or other dispensing devices, for cash. "After application by customers to whom the said Ouellette extends credit he has followed the practice of issuing such stamps when such customers paid for motor fuel so obtained from him before the fifteenth proximo." Ouellette also issues these stamps upon like terms to his customers who purchase other commodities sold by him at his place of business. These trading stamps, when issued to customers, may be collected by them in books to the number of twelve hundred stamps per book, and are then redeemable in merchandise which the customer is entitled to receive from the corporation, the value of such merchandise being approximately $2.50 for each twelve hundred stamps, which amounts to approximately two and eight hundredths per cent of the amounts paid in making the purchases in which the stamps were issued.

The corporation has about forty licensees, including Ouellette, in Massachusetts who are retail dealers in motor fuel and associated products and who have been issuing this type of stamp "in the manner and redeemable as aforesaid, to cash, and after request, to customers paying on or before the fifteenth proximo for motor fuel." The corporation has about eighty licensees in Massachusetts who are retail dealers in motor fuel and associated products and who have been issuing another type of trading stamp in accordance with agreements with the corporation, "to cash and prompt paying customers." A book of twelve hundred of these stamps may be redeemed by the licensee for $2 in cash or $2 in merchandise of the customer's own selection from the stock of merchandise of such licensee. Thereafter, the licensee who has thus redeemed the book of these stamps sends it to the corporation, which pays

him $2. The redemption value, thus realized, of this type of stamp amounts approximately to one and sixty-six hundredths per cent of the amount paid in making the purchases in connection with which the stamps were issued. Ouellette and other licensees of the corporation use these stamps as an advertising medium to attract customers to purchase motor fuel and to induce prompt payment. Upon the enactment of the "motor fuel sales act" (evidently referring to § 295C of said c. 94 as inserted by St. 1938, c. 411 [see now St. 1939, c. 459, § 1]), Ouellette and the other licensees of the corporation who are retail dealers in motor fuel, posted upon their respective pumps a proper sign, as required by said act, showing the price of the motor fuel, including the tax thereon, and also posted in connection with said sign a notice saying that the cash payment of the posted price entitled a purchaser to one trading stamp on each ten cents paid. Samples of these notices relating to the trading stamps, annexed to the bill and referred to as such in the agreed statement of facts, do not reach the dimensions to which price signs are limited by said § 295C. The dealers were notified by the defendant that "in view of the provisions of the motor fuel sales act, sections 295C and 295E" (evidently referring to St. 1939, c. 459, § 1), they could not lawfully post notices relative to the giving of trading stamps, and could not lawfully give them to customers in connection with the sale of motor fuel from the pumps, and they were ordered by the defendant to take the notices down and to refrain from further issuance of the trading stamps in connection with the sale of motor fuel. As the result of further warning to Ouellette from the defendant that it would be necessary for the latter to take further action under the statute, Ouellette, and other licensees of the corporation who operated filling stations, took down the notices referring to the issuance of trading stamps and discontinued giving them to purchasers of motor fuel. As a result "of the enactment of the said motor fuel sales act and the threatened enforcement thereof against the . . . [corporation] and its licensees as aforesaid, compelling the discontinuance of the

use of said notices and stamps in connection with the sale of motor fuels, the business of . . . [Ouellette] in the sale of motor fuels and also in associated products has fallen off, and the business of the . . . [corporation] with its licensees who operate filling stations for the sale of motor fuel has likewise fallen off."

At the hearing before the legislative committees that considered the provisions of "said statute," it appeared that the following conditions within the retail motor fuel industry existed in Massachusetts, and that these are among the conditions that brought about the enactment of this legislation. There had developed a practice of using misleading signs on various pumps maintained by retail gasoline dealers, and of having different prices on different pumps by which purchasers buying gasoline for their motor vehicles were deceived and misled as to the grade, quality and price of the gasoline that was being sold to them. Many dealers, in trying to obtain customers by selling motor fuel at a reduced price, had been adulterating their gasoline with kerosene, which was cheaper, and the "prohibition of a reduction from the net price of motor fuel from that posted" led to such adulteration and similar fraudulent schemes which in turn led to widespread practices of fraud upon customers of motor fuel retail sales establishments, but it is agreed that none of the conditions described before the legislative committees existed at the premises maintained by Ouellette.

The defendant is the director of the division on the necessaries of life of the department of labor and industries, and is vested and charged with the duties of administering and enforcing the provisions of the motor fuel sales act (§ 295H added to G. L. [Ter. Ed.] c. 94 by St. 1939, c. 459, § 1).

The bill sets out the business relation of the plaintiffs, the practice of Ouellette in issuing trading stamps furnished by the corporation, substantially as set forth in the agreed facts, the interest of both plaintiffs in the subject matter of the suit, and the injury to their businesses. They pray for an injunction against the enforcement of the statute in

question, that, in so far as it prohibits the issuance of trading stamps in the circumstances described, it be declared unconstitutional, and that, in so far as it may restrict Ouellette's right, or the right of other retail dealers in motor fuel, to fix or change the price of motor fuel for any period of time, it be declared unconstitutional.

It seems that a brief reference to the statute and its chronological history is of importance. *Kneeland* v. *Emerton*, 280 Mass. 371, 375–376. G. L. (Ter. Ed.) c. 94, entitled "Inspection and Sale of Food, Drugs and Various Articles," covers a wide field and embraces many varied articles. It contained no provisions relative to the sale of motor fuel until by St. 1933, c. 228, introducing a new section, 295A, entitled "An Act to prevent fraud and misrepresentation in the sale of gasoline, lubricating oils and other motor fuels, and to prevent adulteration thereof," provision was made, subject to penalty, against sales from containers of motor fuel of products other than those indicated by some mark of the manufacturer or distributor of the product, if any, appearing on the container, against the adulteration of any of said products offered for sale under such distinguishing marks, and against the substitution therefor of any other motor fuel or petroleum product. The next addition to the law was by St. 1938, c. 411, "An Act prohibiting and penalizing the use of misleading signs relating to the price of gasoline and other motor fuel." Section 295B, which was inserted in c. 94 by St. 1938, c. 411, defined the terms "retail dealer" and "motor fuel," and § 295C provided that every retail dealer of motor fuel shall conspicuously mark his pumps or other dispensing equipment with the price of the motor fuel dispensed therefrom. Further provision was made as to the size of the price signs, the figures thereon, and that no other price signs relating to such fuel should be displayed on or about the premises of the dealer. See *Slome* v. *Chief of Police of Fitchburg*, 304 Mass. 187.

St. 1939, c. 218, entitled "An Act regulating the use by retail dealers in motor fuels of signs relating to the price of such fuels," was declared to be an emergency law and

was approved on May 18, 1939. It was, however, struck out by St. 1939, c. 459, § 1, another emergency law, approved on August 11, 1939. Said c. 459 also struck out said §§ 295A, 295B and 295C, and inserted in place thereof fifteen new sections. The act is entitled, "An Act further regulating the advertising and sale of motor fuel at retail." Briefly, it reënacts, in substance, the original § 295A, contains essential definitions, provides for the licensing of retail dealers of motor fuel, for penalties and the jurisdiction of courts, that sales equipment shall bear the brand or trade mark of the fuel, that certain standards of quality shall apply to sales, that certain records shall be kept and investigations made, and defines the duties of the division on the necessaries of life. These provisions are briefly referred to without reference to the provisions of §§ 295C and 295E, which are directly involved in the case at bar. Said c. 459 made some changes in § 295C as it was enacted by St. 1938, c. 411. By it each dealer was restricted to not more than two signs on each dispensing device, stating the price per gallon of the motor fuel sold, and, although it was provided that no other signs should be posted on the premises, there was a further provision that the signs that could not be posted should not be posted within view of any public highway or reservation.

The material provisions of § 295E that are assailed are (1) the requirement that the price posted on the pump or other dispensing device "shall remain posted thereon and continue in effect thereat for a period of not less than twenty-four consecutive hours. No retail dealer shall sell motor fuel at any price other than the price so posted at the time of the sale," and (2) "No premiums, rebates, allowances, concessions, prizes or other benefits shall be given directly or indirectly by any retail dealer so as to permit any purchaser to obtain motor fuel from such retail dealer at a net price lower than the posted price applicable at the time of the sale." This section also provides that where other commodities or services are sold with motor fuel at a single price or charge, such price or charge shall not be less than the aggregate of the posted price for the

motor fuel plus the charge for the other commodity or service when the same is sold or rendered separately.

We are of opinion that the allegations of the bill not in dispute, and the agreed facts, present a case over which this court has jurisdiction. *Slome* v. *Chief of Police of Fitchburg*, 304 Mass. 187, 188. *Carter* v. *Carter Coal Co.* 298 U. S. 238, 286–288.

We are of opinion that the material portions of the statute here assailed are unconstitutional in that they are violative of arts. 1 and 10 of the Declaration of Rights. In view of our conclusion, it is unnecessary for us to determine whether the posting of the signs relative to the giving of trading stamps is a violation of so much of § 295C as provides that the posted sign, or signs, shall state the "price" per gallon of the motor fuel sold.

Just what a trading stamp is, the nature of the transaction involved in its use, and whether traffic in it may be prohibited, are matters that have engaged the attention of many courts including our own. It has been said that the giving of trading stamps is merely one way of discounting bills in consideration for immediate payment in cash, *Ex parte Hutchinson*, 137 Fed. 949; that the trading stamp business is essentially legitimate and, "so far as the court can discover," it is the only way in which the small purchaser practically obtains a discount for immediate payment, whether that payment is in cash or something else. *Sperry & Hutchinson Co.* v. *Temple*, 137 Fed. 992, 993. See *Ware* v. *Sperry & Hutchinson Co.* 197 Ky. 394, 397; *Ex parte Drexel*, 147 Cal. 763, 773; *State* v. *Holtgreve*, 58 Utah, 563, 571–572; *Winston* v. *Beeson*, 135 N. C. 271, 283; *Sperry & Hutchinson Co.* v. *Weigle*, 169 Wis. 562, 565; *Sperry & Hutchinson Co.* v. *Siegel, Cooper & Co.* 225 Ill. App. 540, 548. In the case of *Merchants Legal Stamp Co.* v. *Murphy*, 220 Mass. 281, it was said, at page 283, "By this arrangement the [trading] stamp or coupon operates as a discount in cash for every purchase made. *Commonwealth* v. *Sisson*, 178 Mass. 578", and in *Opinion of the Justices*, 226 Mass. 613, it was said that in 1911 the justices, when asked their opinion on the question whether a bill in

effect forbidding the use of trading stamps, no matter by whom they were to be redeemed, would be constitutional, gave their answer in the negative. (*Opinion of the Justices,* 208 Mass. 607.) "That opinion was in accord with the almost uniform current of authority as shown by decisions in numerous States where the question had arisen. We see no reason to change the opinion there expressed" (page 616). Reference was made to the decisions in *Commonwealth* v. *Sisson,* 178 Mass. 578, read in connection with *Commonwealth* v. *Emerson,* 165 Mass. 146, and *O'Keeffe* v. *Somerville,* 190 Mass. 110, cases involving construction of the Constitution of Massachusetts. Reference was also made to the decision in *Rast* v. *Van Deman & Lewis Co.* 240 U. S. 342, where a statute, in essence like the one referred to in the question then under consideration, was held not to conflict with the provisions of the Fourteenth Amendment to the Constitution of the United States. It was pointed out that the question whether a statute is in conflict with the provisions of the Constitution of this Commonwealth is a question on which the decision of our Supreme Judicial Court is final; and the Senate was advised that a statute in effect prohibiting the use of trading stamps, no matter by whom they were to be redeemed, would be unconstitutional, and a statute, which should declare trading stamps redeemable by the vendor alone to be legal and those redeemable by anyone other than the vendor to be illegal, likewise would be unconstitutional. The decision in the *Rast* case was rendered in 1916. Other courts have declined to follow it. See *State* v. *Lothrops-Farnham Co. Inc.* 84 N. H. 322; *Denver* v. *United Cigar Stores Co.* 68 Colo. 363; *Ware* v. *Sperry & Hutchinson Co.* 197 Ky. 394; *People* v. *Victor,* 287 Mich. 506. In so far, if at all, as it may be suggested that the statute in question is an indirect attack upon the use of the trading stamp, it is enough to say that the validity of the statute could not be sustained on that ground.

The defendant concedes that the "motor fuel sales act" is neither a price fixing law nor a fair trade law, but that it is designed to prevent fraud upon purchasers in the retail sale

of gasoline as ordinarily carried on in filling stations. In *Slome* v. *Chief of Police of Fitchburg*, 304 Mass. 187, where the provisions of St. 1938, c. 411, were under consideration, it was said, at page 189, "It is apparent from a reading of the statute that its design was to prevent fraud in the retail sale of gasoline." It was also said that the statute in question did not establish prices or impair the freedom of the owner to determine the selling price of his goods, and that "His right as to the location and size of the price signs for motor fuel is all that is restricted." An examination of the fifteen sections inserted in G. L. (Ter. Ed.) c. 94 by St. 1939, c. 459, and now in force, only serves to reinforce and confirm the statement in the *Slome* case that the present statute is designed to prevent fraud in the retail sale of motor fuel.

In the effort to prevent such fraud, the Legislature has enacted that "No premiums, rebates, allowances, concessions, prizes or other benefits shall be given directly or indirectly by any retail dealer so as to permit any purchaser to obtain motor fuel from such retail dealer at a net price lower than the posted price applicable at the time of the sale." In the *Slome* case, the plaintiff was displaying signs and advertising devices on various portions of his premises other than on the pumps or dispensing equipment, and the signs and devices were larger than the size prescribed by the statute. He sought, among other things, to have the defendant enjoined from disturbing any of the price signs as they then existed and from taking any action to enforce so much of § 295C of c. 94 (St. 1938, c. 411) "as relates to the size and location of price signs" at his filling station. The location and size of the price signs were the matters before the court, and it was held that the provisions of the statute in these respects were constitutional. The questions now before the court go beyond those there decided.

The opinions of this court lead to the conclusion that to attempt to forbid the use of trading stamps generally, as a merchandising practice, is a violation of our Constitution, and one question is whether their use in an otherwise perfectly legal transaction may be forbidden in connection with the sale of gasoline. Reference has been made already to

what appeared before the legislative committees as to the use of misleading signs on fuel pumps and the adulteration of gasoline. The "prohibition of a reduction from the net price of motor fuel from that posted led to such adulteration and similar fraudulent schemes, which were resulting in widespread practices of fraud upon customers of motor fuel and retail sales establishments." We are unable to understand the reference to "the prohibition of a reduction from the net price of motor fuel from that posted." We do not understand that there was ever any prohibition, or attempted prohibition, of a reduction until the passage of St. 1939, c. 459, § 1, inserting § 295E in G. L. (Ter. Ed.) c. 94. But whatever this fact may refer to, the statute in question, in so far as it goes, was intended to correct these evils, in short, to prevent fraud.

It is not for us to inquire into the expediency or the wisdom of the legislative judgment. Unless the act of the Legislature cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it, the court has no power to strike it down as violative of the Constitution. *Mueller* v. *Commissioner of Public Health, ante,* 270. But unless justified as a valid exercise of the police power, the act must be declared unconstitutional because the enforcement of it will deprive the plaintiffs of rights secured under the Constitution. The defendant seeks to sustain the act specifically upon the ground that it is reasonably calculated to prevent fraud in the sale of motor fuel, and the determination we are called upon to make is whether the act has a real and substantial relation to that or is a clear and arbitrary invasion of the plaintiffs' rights guaranteed by the Constitution. The police power may be exerted in the form of State legislation where otherwise the effect may be to invade rights guaranteed by the Constitution only when such legislation bears a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare. "A State cannot, 'under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.'"

*Commonwealth* v. *S. S. Kresge Co.* 267 Mass. 145, 151. It is clear that the statute in question bears no relation to public health or safety, and we think that the decisions of this court, already cited, demonstrate that there is no question of morals, in so far as any gambling element is concerned. Apart from the effort to prevent fraud, it does not appear that any other phase of the general welfare is involved. We therefore direct our attention specifically to the inquiry whether the statute in question has a real and substantial relation to that end. *Opinion of the Justices,* 247 Mass. 589, 596. *Howes Brothers Co.* v. *Unemployment Compensation Commission,* 296 Mass. 275, 284.

It was said in *Slome* v. *Chief of Police of Fitchburg,* 304 Mass. 187, at page 191: "The means provided by the statute for the realization of its aim is exhibition of the price exclusively upon the pumps and dispensing equipment. There is a rational connection between the means employed and the end sought"; and at page 192: "The means here involved were appropriate for the attainment of the statutory aim." Among the facts stated in the *Slome* case, it appeared that there had developed a practice of advertising the prices of gasoline on signs, some of which were, in themselves, misleading, and that in many instances where the signs themselves were not misleading, a customer had gone to the wrong pump, or was told that he had, and was asked to pay more for the gasoline than he intended. It was also stated that the price factor had become such a matter of consequence that some dealers, whether for this reason alone or not, had been adulterating their gasoline with kerosene.

We think it clearly appears that the aim of the statute construed in the *Slome* case was to prevent the use of misleading signs, and that this is the fraud referred to in that opinion. Prior to the enactment of St. 1938, c. 411, there was no law requiring that the price of any gasoline be placed on the particular pump from which it was sold, or any regulation relating to the posting of price signs. Prior to that statute, as it appeared in the *Slome* case, these signs were placed on sidewalks, fences, between the sidewalk and the

roadway and in other places on station property and adjacent thereto. The decision in the *Slome* case has been questioned in the case of *Regal Oil Co.* v. *State*, 123 N. J. L. 456, where a statutory provision that no other price sign of motor fuel should be used or displayed on the premises of the dealer other than the signs that were required to be maintained on the pump or other dispensing equipment was held unconstitutional. In that case it was said at page 463, "If the regulation sign serves to prevent fraud and misrepresentation then surely . . . [a dealer's] larger signs should even more effectively tend to accomplish the same result." In the case of *State* v. *Miller*, 126 Conn. 373, a similar provision was also held unconstitutional.

But the present statute goes beyond the requirements of that construed in the *Slome* case, and, under the guise of protecting the public against fraud, has enacted the additional provisions that are here assailed. (G. L. [Ter. Ed.] c. 94, § 295E.) We assume, without deciding, that the language of said § 295E is comprehensive enough to prohibit the giving of trading stamps with the retail sale of motor fuel, and in order to invalidate this prohibition we must be satisfied that the means adopted will not accomplish the aim intended, that is, to prevent fraud or that the prohibition is unreasonable and arbitrary. In *People* v. *Gillson*, 109 N. Y. 389, it was held that a statute making it a misdemeanor for any person who sells food to give away any other thing at the same time and as part of the transaction, as a gift, prize, premium or reward to the purchaser, was unconstitutional. The court said, at pages 405–406: "It [the statute] has no tendency to prevent either [fraud or deception], and its regulation of trade is a mere arbitrary, unreasonable and illegal interference with the liberty of the citizen in his pursuit of a livelihood by engaging in a perfectly valid business, conducted in a perfectly proper manner. . . . To prevent . . . [the giving of a premium] by legislative action does not reasonably or fairly tend to prevent fraud or deception in the sale of articles of food." In *People* v. *Victor*, 287 Mich. 506, decided in 1939, the defendant was convicted of a violation of a public act that

provided, in substance, that a seller of bakery or petroleum products, who, with intent to injure a competitor, gave or offered to give away any commodity for the purpose of helping the sale of any other commodity, should be guilty of a destructive sales practice which was prohibited and declared to be unlawful. Specifically, the dealer gave away a glass worth less than five cents on the sale of five gallons of gasoline. The court held that there was no reasonable relation between the prohibition of giving a premium and the protection of the public health, morals, safety and welfare. It was said, at page 515, that "The prosecution attempted to show that a dealer who gives a premium is more inclined, for that reason, to adulterate his product or to give short measure. No evidence was introduced to prove the contention and there is no logical connection between the practice of giving a premium and a tendency to defraud the public. Nor is there any showing that the public is deceived into buying inferior gasoline by the offering of a premium." In this case, at pages 512-513, there is an extensive collection of cases dealing with the giving of premiums or trading stamps with the purchase of commodities.

Trading stamps have been in use long enough so that any purchaser of merchandise who is interested in acquiring and converting them to his advantage, cannot be said to be likely to be deceived as to their value. As appears from the agreed facts, these stamps represent certain well defined and easily understood rights that the recipient acquires, and there is no reasonable cause to believe that the dealer who offers them in consideration of cash or approved credit sales will resort to fraudulent practices. The price fixed by Ouellette for the sale of his gasoline, if paid for in cash or if sold upon credit, entitled the purchaser to trading stamps. Such a transaction, so clearly free from illegality, has no reasonable connection with any possible fraud in the sale of motor fuel. On the contrary, under the guise of protecting the public from fraud, the enforcement of the statute would result in an arbitrary interference with business and an irrational and unnecessary restriction.

422 SPERRY & HUTCHINSON *v.* DIRECTOR, NEC. OF LIFE. [307

Ouellette contends that he is further aggrieved by so much of said § 295E as provides, in substance, that after he has once posted his price, he cannot change it for twenty-four consecutive hours, nor make any sale of motor fuel at any price other than that so posted at the time of the sale. There is no suggestion that this provision is designed to prevent unfair competition. The defendant strongly contends, as already pointed out, that the act is neither a price fixing nor a fair trade law, but one aimed to prevent fraud upon the purchasing public. But whether this portion of said § 295E is a price fixing measure or a regulatory one, we are of opinion that it is arbitrary and capricious, and therefore unconstitutional. It was held in *Williams* v. *Standard Oil Co. of Louisiana*, 278 U. S. 235, that the business of dealing in gasoline was not affected with the public interest which enabled the State to fix the price for its sale. In the case of *Nebbia* v. *New York*, 291 U. S. 502, at pages 536, 537, the phrase "affected with a public interest" is discussed, and it was said: "But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells. . . . If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied . . . ." *John P. Squire & Co.* v. *Tellier*, 185 Mass. 18, 20. *Commonwealth* v. *Strauss*, 191 Mass. 545, 550–553. *Opinion of the Justices*, 247 Mass. 589. In *State* v. *Woitha*, 227 Iowa, 1, (decided June 20, 1939), a statute was upheld that provided, among other things, that no distributor of gasoline could change or alter the price placard until it should have been posted for a period of twenty-four hours "except to meet a posted competitive price in that community" (page 4), (a provision not contained in the statute in question). In that case it was said that the "sole purpose of the Act is the regulation of the sale of motor vehicle fuel and to prevent unfair methods of doing business" (page 10).

There are many instances in this Commonwealth where

legislative enactments in the nature of the establishment of prices by public authority have been upheld. See *Opinion of the Justices*, 247 Mass. 589, 597, 598. In the opinion just cited, the Senate was advised that by legislation the General Court might require that a price at which theatre tickets may be sold be printed on the face of the ticket; that the business of reselling such tickets could be reasonably regulated and licensed; that it could be required that the resale price of tickets should be stamped thereupon and that a limit could be imposed reasonably calculated to prevent extortion but affording a reasonable profit on the resale price by persons engaged in such business. But the Senate was also advised that the General Court could not constitutionally enact legislation requiring that no ticket should be sold or resold at a price in excess of that printed on its face. There is a marked difference between the business of selling gasoline at retail and that of reselling theatre tickets. The regulatory instances cited, to which reference has been made, also relate to businesses altogether different from that of the sale of gasoline. Furthermore, in these cases there can be no doubt that the decisions rested upon the sound basis that the laws in question were not arbitrary in their operation and effect.

It is contended in the case at bar that the fact that the price posted on any pump shall remain thereon and continue in effect for twenty-four hours will result in a disappearance of the practice of adulterating gasoline, and will also protect the public from being deceived as to its price, quality or grade. Upon reflection, it would seem that the result is likely to be the very reverse. It is to be observed that the statute does not provide any time for the posting of the price notice. A dealer on one of four corners of an intersection, each corner having a filling station, may post his price at eight o'clock in the morning. The next dealer may delay the posting of his price a few minutes and thereupon display a lower price. The other two dealers may follow consecutively with still lower prices. Under the terms of the statute there can be no changes in the prices posted for twenty-four hours. Nothing can be

done honestly to meet the price competition that the
statute has imposed. If conditions as to prices before the
enactment of the statute in question led a dealer to adul-
terate gasoline, it would seem that now the temptation to
do so would be all the greater.

It is a well known fact that gasoline is dispensed, as a
rule, to the retail trade from underground tanks limited
as to capacity which must be refilled from time to time
from supply wagons. Account does not seem to have
been taken of the fact that during any twenty-four hour
period the wholesale price of gasoline may change either
up or down, and that regardless of this reasonable possi-
bility, the retail dealer, under the statute in question, may
be deprived to his loss of an opportunity to meet an in-
crease in price or to pass along the benefit of a reduction to
the purchasing public.

Even if the regulation of the price of gasoline, in so far
as the protection of the public is concerned, cannot be
left to competition, and, as has been decided, the posting
of price signs limited as to size is to be helpful to the public
in the direction of their protection, it surely is not necessary
for this protection that the price signs should not be changed
for twenty-four hours. The dealer may fix his own price.
It may vary from the price of his competitors. The source
of his supply, the nature of his business, and other factors
may warrant him in offering gasoline at his price. The
fact that all prices must be posted does not relieve the
purchaser, if he has any real interest in the subject matter,
from the exercise of some degree of vigilance in order to
determine what price he is to pay for the particular brand
of gasoline that he is buying. Upon his approach to a
filling station he has no means of knowing from appearances
when the price was posted. The twenty-four hour period
may have just begun or be just ending. The law gives him
no greater security than he had before. After all, he does
not have to purchase at any station unless he wishes, and
whether the price is posted at six o'clock in the morning
or at noon, it is that price which the purchaser must con-
sult, if he cares to, in order to determine whether he is

willing to pay it. It was said in *Opinion of the Justices*, 247 Mass. 589, at pages 595–596, "The circumstance that a business is affected with a public interest does not make legally possible every legislative regulation. All such regulations must be reasonable in their nature, directed to the prevention of real evils and adapted to the accomplishment of their avowed purpose. Under the guise of protecting the general welfare there cannot be arbitrary interference with business or irrational or unnecessary restriction. When it becomes established that a business is subject to legislative regulation because affected with a public interest and devoted to a public use, incidental and accessory features reasonable in scope and fair in aim fall under the same rule."

It follows that the plaintiffs are entitled to an injunction against the defendant restraining him from interfering with or prosecuting the plaintiffs or other licensees of the corporation in respect of the matters covered by, and in accordance with, this opinion, the details of which are to be settled by a judge of the Superior Court.

*Ordered accordingly.*